UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

CIVIL ACTION NO. 3:13-CV-315-JGH

MIGLIORE & ASSOCIATES, LLC and
LISA MIGLIORE BLACK                                    PLAINTIFFS

v.

KENTUCKIANA REPORTERS, LLC                            DEFENDANT

**MEMORANDUM OPINION AND ORDER**

The court reporter game is a tough racket.  It's tougher still when a competitor registers

an internet domain name that is confusingly similar to your business name then links it to its own

website.  That is what Lisa Migliore Black, the sole member of Migliore & Associates, LLC

(together "Migliore"), accuses Kentuckiana Reporters, LLC ("Kentuckiana") of doing.  Migliore

has sued Kentuckiana under the Lanham Act (15 U.S.C. § 1125(a)), the Anticybersquatting

Consumer Protection Act ("ACPA," 15 U.S.C. § 1125(d)), and Kentucky common law

prohibitions against unfair competition.  In increasingly venomous briefings, Kentuckiana has

asked the Court for summary judgment; Migliore wants to try the case.  For the following

reasons, the Court denies Kentuckiana's motion.

I.

Lisa Migliore began working as a court reporter in Louisville in 1997.  She established

the Kentucky LLC "Migliore & Associates" in 2001—she was and still is its sole member.  She

married in 2009, but because of the goodwill and name recognition attached to her maiden name,

she kept "Migliore" as part of her married name.  Today, her name is "Lisa Migliore Black," yet

she answers to variations on her name like "Lisa Migliore," "Lisa Black," and even "Lisa Mig."

Her LLC's name has not changed.  Since 2005 Migliore has maintained a website at www.miglioreassociates.com.  She may be the only "Migliore" doing court reporting in the United States.  Searches on popular internet search engines associate her with court reporting and Migliore & Associates.  And Migliore has spent thousands of dollars each year promoting her business through advertising in print publications; internet listings; and the distribution of marketing materials like mugs, pens, and post-it notes.

Kentuckiana is also a single-member Kentucky LLC in the Louisville area.  It uses the domain name www.kentuckianareporters.com.  Bekah Turner McDonner has been the sole owner of Kentuckiana since July 2010.  Her husband, Michael McDonner, is a former attorney who now works as Kentuckiana's business development manager.  In August 2011 Kentuckiana registered the following domain names with GoDaddy.com, LLC: www.andorreporters.com, www.actionreporters.com, www.coultereporting.com, www.coulterreporters.com, www.kentuckycourtreporting.com, www.kycourtreporter.com, and www.lisamigliore.com.  Of those seven domain names, five—including, of course, www.lisamigliore.com—were similar or identical to the business names of Kentuckiana competitors.  At some point, Kentuckiana linked www.lisamigliore.com and the other sound-alikes to its own website, which re-routed the web traffic to its site.  This means, for example, that anyone who typed in "www.lisamigliore.com" and hit "Enter" would be redirected to Kentuckiana's website.  One of Kentuckiana's competitors noticed the anomaly and warned Migliore.

Migliore sent a cease and desist letter in June 2012.  Kentuckiana discontinued redirection to its own website, but it refused to transfer the domain name to Migliore.  That August, Migliore proceeded under the Uniform Dispute Resolution Policy and filed a complaint with an arbitral panel of the World Intellectual Property Organization Arbitration and Media

Center ("WIPO").  Kentuckiana maintained that it registered the disputed domain name to use it as a possible "gripe site" or "fact check site" regarding Migliore's public comments on policy issues related to the court reporter industry.  Yet www.lisamigliore.com was never developed— no content was ever put on it.  Ultimately, the WIPO arbitrator decided that Kentuckiana acted in bad faith and ordered it to transfer the domain name to Migliore.  But since Kentuckiana still refused to reimburse Migliore for the costs of bringing the WIPO action, Migliore filed this suit. Discovery is now complete, Kentuckiana has moved for summary judgment.

## II.

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c).  The Court must determine whether "the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Patton v. Bearden*, 8 F.3d 343, 346 (6th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  The Court will view the evidence in the light most favorable to Migliore, the non-movant, and draw all reasonable inferences in her favor.  *See Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

## III.

First, Kentuckiana argues that Migliore lacks standing to make a Lanham Act claim.  "In essence the question of standing is whether the litigant is entitled to have the court decide the merits of the dispute or of the particular issues . . . .  As an aspect of justiciability, the standing question is whether the plaintiff has 'alleged such a personal stake in the outcome of the

controversy' as to warrant his invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on his behalf." *Warth v. Seldin*, 422 U.S. 490, 498-99 (1975) (citing *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  The key component of standing is the "case-or-controversy requirement of Article III (of the United States Constitution)." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citation omitted)).  The case-in-controversy inquiry requires three elements to establish standing. *See id.* at 560-61.  Pertinent to our case, the first element is that "the plaintiff must have suffered an 'injury in fact'—an invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not 'conjectural' or 'hypothetical.'" *Id.* at 560 (citations omitted).

As a general matter, the Court feels it necessary to note that just because an injury is difficult to measure or quantify does not mean that the injury is nonexistent. *See, e.g.*, *Eastman Kodak Co. of New York v. Southern Photo Materials Co.*, 273 U.S. 359 (1927).  Kentuckiana's counsel conflates the concepts of "injury" and "provable money damages."  Beyond legal niceties, it borders on the absurd to assert that purchasing a domain name that includes a variation of a competitor's personal name, then linking that website to your own, would cause no injury to your competitor.  But that is essentially Kentuckiana's argument.  Kentuckiana admits it registered these domain names; it admits that www.lisamigliore.com was linked to redirect to its own site.  Yet it denies that Migliore has suffered anything more than a conjectural or hypothetical injury.  The Court is convinced, however, that Migliore has a true case-in-controversy because, at the very least, Migliore incurred damage control costs that satisfy the injury requirement for Article III standing.

In *Balance Dynamics Corp. v. Schmitt Industries, Inc.*, the Sixth Circuit explained that courts must be careful to distinguish "the elements necessary to prove a breach of the Lanham

4

Act from the elements necessary to justify a certain remedy for the breach: 'the inquiries should be kept separate because a violation of the Lanham Act can be remedied in more ways than one.'" 204 F.3d 683, 689 (2000) (citation omitted). The court then noted that some types of damages fall outside of "actual" or "marketplace"[1] damages. Lanham Act plaintiffs can sometimes recover for damage control without showing actual confusion or actual damages. *Id*. at 689-90. Damage control costs are what they sound like: they are costs plaintiffs must incur to protect themselves from nefarious acts of their competitors. "[L]ike an injunction, damage control is undertaken precisely to prevent such things as lost sales, lost profits, and lost goodwill." *Id*. at 691.

The Sixth Circuit relied on the policy rationale that "[t]he law should encourage quick responses and the mitigation of damage, and should not require parties to suffer an injury before trying to prevent it." *Id*. at 691-92. In sum, the Sixth Circuit decided that "a plaintiff should not be required to give up compensation for its damage control expenses when the defendant's wrongful action necessitated those expenses in the first place." *Id*. at 692. A plaintiff will be entitled to damage control costs when it can show (1) likelihood of confusion or damage to profits, goodwill, or sales; (2) that the damage control expenses were caused by defendant's Lanham Act violation; and (3) that the damage control efforts were reasonable and proportionate to the damage likely to occur. *Id*. at 692-93.

A request for damage control costs is appropriate here. As in *Balance Dynamics*, Kentuckiana's actions could have harmed Migliore's business. She reached out to Kentuckiana and, to its credit, Kentuckiana stopped the redirection of www.lisamigliore.com to www.kentuckianareporters.com. It still refused, however, to turn over www.lisamigliore.com to Migliore. Fearing lost business, Migliore commenced a WIPO proceeding. After determining

---

[1] Marketplace damages could include, for example, lost sales, lost profits, or lost goodwill.

that Kentuckiana acted in bad faith, the WIPO arbitrator had Kentuckiana transfer the domain

name to Migliore.  It cost Migliore—including attorneys' fees—$4,000 to pursue the WIPO

action.  Viewing the facts in the light most favorable to Migliore, the non-movant, enough has

been presented to convince the Court that Migliore suffered actual harm, as evidenced by its

need to expend reasonable damage control costs to prevent damage to its profits and goodwill

caused by Kentuckiana's bad faith act.  Migliore has enough for standing under the Lanham Act,

so the Court need not consider at this stage the other damages Migliore claims from the alleged

Lanham Act violation.

Kentuckiana argues that the Sixth Circuit has precluded this measure of damages in this

type of case.  Kentuckiana believes that the Sixth Circuit limited damage control costs to false

advertising cases, and that this Court's decision to allow it in a trademark infringement claim

would be "an unprecedented extension of existing law."  DN 59, Page ID # 887-88.

To this Court's understanding, damage control costs and presumed damages are two

entirely different measures; this is evidenced by the Sixth Circuit addressing the two in different

passages of its *Balance Dynamics* opinion.  *See* 204 F.3d at 689-96 (where the Sixth Circuit

addresses damage control costs on pages 689-93 but does not discuss presumptive damages until

the bottom of page 694).  Thus, the Sixth Circuit's directive that presumptive damages be

narrowly limited to cases of comparative false advertising is irrelevant here.  Damage control

costs show injury in fact, and so Migliore has standing to pursue a Lanham Act claim.

IV.

Kentuckiana also contends that Migliore's Lanham Act claim is not viable because (1)

Migliore lacks a protectable interest in www.lisamigliore.com and (2) Kentuckiana's use of that

domain name was not likely to cause confusion within the purchasing community for court

reporting services.  On both points, the Court believes that there exists a genuine issue of material fact.  Thus, summary judgment is inappropriate.

It cannot be said as a matter of law that Migliore does not have a protectable interest in www.lisamigliore.com.  A trademark need not be registered to be protectable, but if it is not registered, it must be distinctive.  *See Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 280 F.3d 619, 635 (6th Cir. 2002).  A mark is distinctive if it is either inherently distinctive or has acquired a secondary meaning.  *Maker's Mark Distillery, Inc. v. Diageo N. Am.*, 679 F.3d 410, 420 (6th Cir. 2012).  First and last names are considered "descriptive" marks, meaning they are "inherently non-distinctive and accordingly are not protected under the Lanham Act absent a showing of distinctiveness."  *Carl v. bernardjcarl.com*, 662 F. Supp. 2d 487, 494-95 (E.D. Va. 2009); *see also Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996).  Descriptive marks can become distinctive through the development of a secondary meaning in the relevant consumer community.  *Carl*, 662 F. Supp. 2d at 495.

Seven factors help determine whether a distinctive mark has gained a secondary meaning: (1) consumer testimony; (2) consumer surveys; (3) duration, exclusivity, and manner of use; (4) level of advertising; (5) number of customers and sales; (6) place in the market; and (7) proof of intentional copying.  *Herman Miller, Inc. v. Palazzetti Imports and Exports, Inc.*, 270 F.3d 298, 311-12 (6th Cir. 2001).  No single factor is outcome determinative, and a plaintiff need not prove each factor.  *See id.* at 313.  Here, material facts are in dispute, and so a jury must decide whether "Lisa Migliore" has attained secondary meaning in the relevant purchaser market.

The first two factors hurt Migliore.  It appears that Migliore has no consumers ready to testify about the distinctiveness of "Lisa Migliore" and no consumer surveys on the topic.  There are, however, reasons to believe the other factors have been met.  Lisa Migliore Black has been a

court reporter in Louisville since 1997.  She is the only "Migliore" court reporter in Louisville.

Indeed, she may be the only "Migliore" court reporter in the entire Republic.  Internet searches

link her name to Migliore & Associates and court reporting.  Even though she married years ago,

she kept her maiden name as part of her married name because of the time she spent providing

her services as "Lisa Migliore."  As well, Migliore spends thousands each year on advertising—

on both actual ads and advertising merchandise like mugs and pens.  Over the seventeen years

that Migliore has operated, she has met with and provided services for thousands of customers.

Other court reporters—even Kentuckiana at one point—have referred business to Migliore.  And,

most glaring, others have intentionally copied her name.  Kentuckiana's registration of

www.lisamigliore.com helps establish secondary meaning since, "'[t]here is no logical reason for

the precise copying save an attempt to realize upon a secondary meaning that is in existence.'"

*Herman Miller*, 270 F.3d at 314 (citation omitted).  Kentuckiana claims it meant to use the

domain name as a gripe site.  Fine.[2]  But no one would have visited this gripe site—and

Kentuckiana's copying would have been futile—if "Lisa Migliore" had not attained some

secondary meaning.  The jury must answer this question.

Next, the Court also finds a genuine issue of material fact as to whether Kentuckiana's

use of www.lisamigliore.com was likely to cause confusion.  The Sixth Circuit uses an eight

factor test for likelihood of confusion: (1) strength of plaintiff's mark; (2) relatedness of the

goods; (3) similarity of the two marks; (4) showing of actual confusion; (5) use of marketing

channels; (6) estimated degree of purchaser care; (7) defendant's intent in selecting the mark; (8)

likelihood of expansion of product lines.  *Abercrombie*, 280 F.3d at 646 (citation omitted).  As

with secondary meaning, at least a couple of these factors may harm Migliore.  After all,

---

[2] The Court will have more to say on this later.

Migliore presents no showing of actual confusion amongst real customers.  And Kentuckiana continues to aver that it meant to use www.lisamigliore.com as a gripe site or fact check site.

Yet the facts warrant sending this issue to the jury as well.  Again, there is reason to believe that "Lisa Migliore" is a stronger mark than Kentuckiana lets on.  Remember: it copied the mark.  It did so for a reason.  Both Kentuckiana and Migliore provide the same services—or, at a minimum, fungible services.[3]  They were using the same marketing channel: the internet.  One could argue that the purchasers of court reporting services—attorneys, by and large—are sophisticated clients who are likely to take great care.  It is not unimaginable, though, that an attorney who was referred by a colleague to "Lisa Migliore" may, after being redirected from www.lisamigliore.com to www.kentuckianareporters.com, believe that "Lisa Migliore" is in fact associated with Kentuckiana and pay for Kentuckiana's services without further inquiry.  Though Kentuckiana says it wanted to create a gripe site, it never added any content to www.lisamigliore.com.  Given the redirection—and Kentuckiana's registration of multiple competitors' names as domain names—it's easy to infer that Kentuckiana had a more sinister motive.  Put simply, it is easy to infer that Kentuckiana merely wanted to redirect customers away from Migliore and other rivals to its own website.  Based on all of these factors,[4] the Court will deny summary judgment.

## V.

The Anticybersquatting Consumer Protection Act ("ACPA," 15 U.S.C. § 1125(d)) is an amendment that Congress added to the Lanham Act in 1999 to stop cybersquatting.  *DaimlerChrysler v. The Net Inc.,* 388 F.3d 201, 204 (6th Cir. 2004).  Cybersquatting is the act of registering a domain name that incorporates someone else's trademark, then attempting to profit

---

[3] Migliore focuses on stenographic court reporting, while Kentuckiana pushes digital reporting.

[4] The Court does not believe that the eighth factor is relevant in this case.

from the registration through either extorting the trademark holder or diverting business away from the trademark holder. *Id.* To violate the ACPA, there must be: (1) a valid trademark entitled to protection; (2) that is distinctive or famous; (3) a defendant with a domain name that is identical or confusingly similar to the owner's mark; and (4) the defendant must use, register, or traffick in the domain name with (5) a bad faith intent to profit. *Id.* at 204.

The Court cannot grant summary judgment on this issue. As discussed at length in the Lanham Act section of this opinion, enough evidence exists to contend that "Lisa Migliore" was a valid mark that had become distinctive through development of secondary meaning in the relevant purchasing community. And if the jury determines that there was a protectable, distinct mark, the domain name www.lisamigliore.com is identical to that "Lisa Migliore" mark. It is also undisputed that Kentuckiana registered the domain name, and that the domain name was redirected to www.kentuckianareporters.com. It can also be inferred from the facts that Kentuckiana registered the domain name with a bad faith intent to profit. This was not an isolated incident: Kentuckiana registered copycat domain names for several competitors, not just Migliore.[5] Each of these, like www.lisamigliore.com, redirected to Kentuckiana's site. It is not absurd to presume that when Kentuckiana did all of this, it did so to divert business away from its competitors.

Kentuckiana reserved its most vigorous arguments for disputing this inferred bad faith intent. Kentuckiana says repeatedly that it was "impossible" for Kentuckiana to have redirected these websites to its own. This assertion, though, is what's impossible—the sites must have been redirected since the problem was discovered and since Kentuckiana has acknowledged there was

---

[5] The other competitors and corresponding domain names registered by Kentuckiana were An/Dor Reporting & Video Technologies, Inc. (www.andorreporters.com); Coulter Reporting, LLC (www.coulterreporting.com and www.coulterreporters.com); and Action Court Reporters (www.actionreporters.com).

redirection.  Kentuckiana parries: It says that its webmaster was the only person with the know-how or ability to cause this redirection, and that because Kentuckiana never told him to redirect, this must have been an accident.  Fair enough.  But Migliore claims otherwise, the bad faith inference is reasonable, so there is a genuine issue of material fact that warrants sending these questions to the jury.

After exhaustive briefing on how it had not offended the ACPA, Kentuckiana in the end clings to a statutory "safe harbor" that permits the registration of gripe sites.  This safe harbor negates the bad faith intent requirement for ACPA liability when a defendant can show it "believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful."  15 U.S.C. § 1125(d)(1)(B)(ii).  Lawful uses can include sites dedicated to "'parody, comment, criticism, comparative advertising, news reporting, etc.'"  *Lamparello v. Falwell*, 420 F.3d 309, 314 (4th Cir. 2005) (citation omitted).  Kentuckiana claims that it registered www.lisamigliore.com to one day gripe about Migliore's policy positions.[6]  In inspired briefing, Kentuckiana asks this Court not to punish it for exercising its First Amendment right to take part in the political process via this nascent gripe site.  There remain, however, troubling questions.  If this was a gripe site, why was content never added?  Why did Kentuckiana register similar domain names to other competitors, even when some of those competitors were not involved in the relevant public policy debate?  Why did the domain names redirect to Kentuckiana's site?  Perhaps redirection was an accident, as Kentuckiana claims.  Perhaps not.  The point is this: the facts, viewed in the light most favorable to Migliore, indicate that Migliore should be given her day in court.  These are all questions for the jury, and Migliore will need to prove that Kentuckiana acted in bad faith.  Meanwhile, Kentuckiana will have the

---

[6] A showdown may have been on the horizon between traditional, stenographic reporting and digital reporting.

chance to convince the jury that it really is a champion of First Amendment freedoms and not merely seeking a quick buck off its competitor's coattails.

## VI.

Finally, Kentuckiana wants this Court to rule on Migliore's unfair competition claim. The parties agree on the relevant law.  Kentucky law requires a showing of "either (1) injuring the plaintiff by taking his business or impairing his good will, or (2) unfairly profiting by the use of the plaintiff's name, or a similar one, in exploiting his good will."  *Covington Inn Corp. v. White Horse Tavern, Inc.*, 445 S.W.2d 135, 139 (Ky. 1969).  "[T]he intent to deceive is the gravamen of the offense in all cases of this character," and so "the intent with which the name is used, the manner in which it is used, and whether the public is deceived or confused by the use of the name to the detriment of the business offended" is the focus.  *Id*. (citation omitted). Kentuckiana argues that Migliore cannot prove injury and cannot prove that Kentuckiana unfairly profited from the registration of www.lisamigliore.com.

Again, it appears that Kentuckiana's counsel conflates the concepts of injury and provable monetary damages.  Like the other claims, summary judgment is inappropriate here. This, too, should be decided by reasonable jurors.

Being otherwise sufficiently advised,

IT IS HEREBY ORDERED that Defendant's motion for summary judgment is DENIED.

cc:     Counsel of Record